UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POTAYTO-POTAHTO, LLC d/b/a FALAFEL TACO; DOUGICABAN, INC. d/b/a QUAKER HILL TAVERN; and CAM-OMO INC. d/b/a CARMINE MINARDI NYC, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

VISA INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; and MASTERCARD INTERNATIONAL INCORPORATED,

Defendants.

No. 26-cv-________

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Potayto-Potahto, LLC d/b/a Falafel Taco, Dougicaban, Inc. d/b/a Quaker Hill Tavern, and CAM-OMO Inc. d/b/a Carmine Minardi NYC, on behalf of themselves and all others similarly situated (the "Class"), by their undersigned attorneys, for their complaint against Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, Mastercard Incorporated, and Mastercard International Incorporated, allege as follows:

## NATURE OF THE ACTION

1. This putative class action challenges one of the longest-running and most lucrative cartels in the history of the United States. For over a half-century, Visa and Mastercard have colluded with the nation's largest banks to fix the Interchange Fees that Merchants pay the banks on every Credit Card transaction. Visa and Mastercard architect and police this conspiracy by setting artificially high rates and imposing a set of rules on Merchants designed to ensure those default rates prevail. Chief among these is a rule requiring Merchants that accept any Visa or

Mastercard Credit Card to accept all such cards, regardless of cost. Banks have no incentive to compete for Merchant acceptance by lowering their fees, so none does. The scale of the scheme is staggering, with the banks collecting fees totaling more than $100 billion annually.

2. Visa and Mastercard have fought fiercely to preserve these anticompetitive practices and to limit their financial exposure through litigation and settlement. In 2019, they settled a long-running damages class action by compensating Merchants for harm suffered during the class period (ending January 24, 2019), without regard to any subsequent harm. In exchange, Visa and Mastercard secured far more than a release for past claims: they obtained a release extending years into the future, purporting to bar claims arising from the same ongoing conduct through August 8, 2028. The settlement did not resolve claims for injunctive relief: those claims proceeded in a separate injunction class action, which remains ongoing, and the challenged conduct has continued in the meantime. In effect, Visa and Mastercard sought to purchase through settlement a license to continue violating the antitrust laws—immunizing themselves from damages claims while they continued their same course of harmful conduct.

3. This "Future Release" resulted in certain absent class members receiving inadequate representation and inequitable treatment. A Merchant that first accepted Credit Cards on the last day of the class period, for instance, would never agree to a deal in which it received only one day of relief and yet had to release nearly ten years of future claims. The class representatives, each in business for the full fifteen-year class period, clearly had a different calculus—leading them to accept a deal that newer Merchants would have spurned without hesitation. The Future Release also violated public policy by undercutting "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action." *Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 328 (1955).

4. While the 2019 Settlement Agreement received court approval, the Second Circuit cast doubt on the legality and, thus, enforceability of the Future Release. The court had no occasion to resolve that issue, however, since the release contains a "de-facto severability clause," which provides that the release "extends to, but only to, the fullest extent permitted by federal law," ensuring "that the Settlement Agreement will stand even if certain aspects of the release were to fall." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023) (alteration adopted). A decision as to the enforceability of the Future Release, the court explained, would have to "await a case in which the issue would directly affect the proceedings." *Id.*

5. That case has now arrived. Merchants have continued to suffer harm as Visa and Mastercard have maintained the same anticompetitive practices that existed in the earlier class action—practices that helped generate more than $700 billion in fees since the close of the last class period on January 24, 2019. The antitrust laws entitle Merchants to compensation. Visa and Mastercard cannot escape liability by invoking the Future Release, as that provision violates federal law and is therefore invalid.

6. Plaintiffs bring this action on behalf of Merchants that have accepted Visa and/or Mastercard Credit Cards in the United States since January 25, 2019. They seek a declaration that the Future Release is invalid and unenforceable, and damages for the supracompetitive Interchange Fees they have paid and continue to pay during the Damages Period.

## JURISDICTION AND VENUE

7. This action is brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain a declaration that the release of future claims from the 2019 Settlement Agreement is invalid. This Court has jurisdiction over the claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

8. Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. § 22. Defendants are subject to personal jurisdiction in this District based on the acts alleged herein. Defendants transact business and are found in this District. The interstate trade and commerce involved and affected by the alleged violations of antitrust law occurred, in part, within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District.

## DEFINITIONS

9. The following terms are used in this Complaint:

a. "Acquirer" or "Acquiring Bank" means a bank or other financial institution that is authorized by a Credit Card Network to enter into agreements with Merchants enabling those Merchants to accept Credit Cards for payment. Acquiring Banks process Merchant transactions through the Visa and Mastercard Networks, transmit authorization requests to Issuing Banks, and enforce the Visa and Mastercard rules in their agreements with Merchants.

b. "All Outlets Rules" are rules of the Visa and Mastercard networks that require a Merchant operating multiple outlets under a common trade name or banner, or otherwise treated as a single merchant by the Visa or Mastercard network or Acquiring Bank, to accept Visa or Mastercard at all such outlets, thereby restricting the Merchant's ability to vary card acceptance across locations.

c. "Cardholder" means an individual who holds and is authorized to use a Credit Card to purchase goods or services from Merchants.

d. "Damages Period" means the period from January 25, 2019 to the date of judgment.

e. "Default Interchange Fees" refer to the fee schedules set by Visa and Mastercard that apply to every transaction for which the Issuer and Merchant have not entered into a separate, individually-negotiated agreement regarding fees.

f. "Credit Card" means a plastic card, digital wallet, mobile device, or other form factor, such as a key fob or virtual card number, usually provided by an Issuer, that allows Cardholders to pay for goods and services at a large number of diverse Merchants by accessing a line of credit extended to the Cardholder by the Issuer.

g. "Credit Card Network" means an electronic payment system used to accept, transmit, or process transactions made using Credit Cards for goods or services and to transfer information and funds among Issuers, Acquirers, Merchants, and Cardholders.

h. "Credit Card Network Services" means the services and infrastructure that a Credit Card Network and its members require Merchants to use in order to accept Credit Cards and through which Credit Card transactions are conducted, including authorization, clearance, and settlement.

i. "Future Release" refers to the provision in paragraph 31(a) of the 2019 Settlement Agreement in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-md-1720 (E.D.N.Y.) ("MDL"), that purports to release claims that accrue after the close of the class period on January 24, 2019, which arise from the same alleged anticompetitive conduct at issue in the MDL.

j. "Honor All Cards Rules" are rules of the Visa and Mastercard networks that require any Merchant that accepts Visa- or Mastercard-branded Credit Cards to accept all Visa- or Mastercard-branded Credit Cards issued on that network.

k. "Interchange Fees" are fees paid to Issuers by Merchants in conjunction with Credit Card transactions. Interchange Fees include both Default Interchange Fees, set by the Credit Card Networks, as well as the fees individually negotiated between an Issuer and Merchant. Interchange Fees are deducted from the transaction amount before the Merchant receives settlement funds and constitute the largest component of the Merchant Discount Fee.

l. "Issuer" or "Issuing Bank" means a bank or other financial institution authorized by a Credit Card Network to issue Credit Cards to Cardholders.

m. "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason.

n. "Member Bank" means a bank that issues Credit Cards or acquires transactions for Merchants on the Visa or Mastercard networks.

o. "Merchant Discount Fee" is the total sum deducted from the amount a Merchant receives in settlement of Visa and/or Mastercard transactions. The Merchant Discount Fee consists of three principal components: (1) Interchange Fees, paid to the Issuing Bank; (2) Network Fees, paid to Visa and/or Mastercard; and (3) fees retained by the Acquiring Bank. Of these, Interchange Fees constitute the largest component.

p. "Network Fees" are fees imposed by Visa and Mastercard in connection with Credit Card transactions and passed through to Merchants as part of the Merchant Discount Fee. Network Fees are deducted from the transaction amount before the Merchant receives settlement funds.

q. "Network Rules" means the operating rules and regulations imposed by Visa and Mastercard governing the issuance of Credit Cards, the acquiring and processing of Credit Card transactions, and the conduct of Merchants and Member Banks.

r. "No Bypass Rules" are rules of the Visa and Mastercard networks that prohibit Merchants and Member Banks from bypassing the Visa or Mastercard network in order to clear, authorize, or settle Credit Card transactions on an alternative network even if the Issuing and Acquiring Banks are the same or even if a third-party processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

s. "No Discount Rules" are rules of the Visa and Mastercard networks that prohibit Merchants from offering discounts or other incentives designed to steer customers toward the use of competing payment cards or other payment methods.

t. "No Competing Marks Rules" are rules of the Visa and Mastercard networks that prohibit Credit Cards carrying the Visa or Mastercard brand from also carrying the brand of a competing network.

u. "No Surcharge Rules" are rules of the Visa and Mastercard networks that restrict a Merchant's ability to charge Cardholders a surcharge on Credit Card transactions to reflect cost differences among various payment methods—for example, by surcharging a Cardholder who pays with a Visa or Mastercard Credit Card rather than with cash, check, or a Discover-branded Credit Card, or by surcharging a Cardholder who pays with a Premium Credit Card rather than a standard Credit Card.

v. "Premium Credit Card" means a Credit Card classified by a network within a higher-interchange product tier—typically marketed with enhanced Cardholder benefits or rewards and associated with higher Interchange Fees than standard Credit Cards.

w. "2019 Settlement Agreement" refers to the class settlement agreement entered into in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-md-1720 (E.D.N.Y.), Dkt. 7257-2, which received preliminary approval from the district court on January 24, 2019, and final approval on December 16, 2019. The settlement resolved claims brought by a damages-only class of Merchants against Visa, Mastercard, and certain Member Banks arising from the setting of Default Interchange Fees and the enforcement of Network Rules.

## PARTIES

### I. PLAINTIFFS

10. Plaintiff Potayto-Potahto, LLC d/b/a Falafel Taco is a restaurant with its principal place of business in Pleasantville, New York. It has accepted Visa- and Mastercard-branded Credit Cards since before January 25, 2019, and has continued accepting those cards throughout the Damages Period to date. Accordingly, it has paid—and continues to pay—Visa's and Mastercard's supracompetitive fees and has been injured in its business and property as a result of the unlawful conduct alleged herein.

11. Plaintiff Dougicaban, Inc. d/b/a Quaker Hill Tavern is a restaurant and bar with its principal place of business in Chappaqua, New York. It has accepted Visa- and Mastercard-branded Credit Cards since before January 25, 2019, and has continued accepting those cards throughout the Damages Period to date. Accordingly, it has paid—and continues to pay—Visa's and Mastercard's supracompetitive fees and has been injured in its business and property as a result of the unlawful conduct alleged herein.

12. Plaintiff CAM-OMO Inc. d/b/a Carmine Minardi NYC is a hair salon with its principal place of business in New York, New York. It has accepted Visa- and Mastercard-branded Credit Cards since before January 25, 2019, and has continued accepting those cards throughout the Damages Period to date. Accordingly, it has paid—and continues to pay—Visa's and Mastercard's supracompetitive fees and has been injured in its business and property as a result of the unlawful conduct alleged herein.

### II. DEFENDANTS

13. Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendants Visa U.S.A. Inc. and Visa International Service Association are Delaware corporations and direct or indirect subsidiaries of Visa Inc. Visa Inc.,

Visa U.S.A. Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

14. Defendant Mastercard Incorporated is a Delaware corporation with its principal place of business in Purchase, New York. Defendant Mastercard International Incorporated is a Delaware corporation and the principal operating subsidiary of Mastercard Incorporated. Mastercard Incorporated and Mastercard International Incorporated are referred to collectively as "Mastercard" in this Complaint.

## CO-CONSPIRATORS

15. As the Second Circuit has explained, Visa and Mastercard historically were "not single entities; they [were] consortiums of competitors." *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). Before the corporate restructuring described below, *see infra* ¶¶ 40–46, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of [Credit Cards] and the acquiring of merchants' transactions." *Id.* Visa and Mastercard were thus "structural conspiracies" and "walking conspiracies." The Member Banks never withdrew from such conspiracies following the restructuring of Visa and Mastercard into public companies. *See infra* ¶¶ 40–46.

16. Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators include, but are not limited to, the following: (a) Issuing Banks that agreed to charge uniform, collectively fixed Interchange Fees to Merchants; and (b) Acquiring Banks that participated in the conspiracy to collectively fix Interchange Fees by enforcing those fees through their agreements with Merchants.

# FACTUAL ALLEGATIONS

## I. Origins and Evolution of the Networks.

17. Visa and Mastercard are global Credit Card Networks that were formed by Member Banks to develop, promote, and operate national and international Credit Card payment systems. Visa and Mastercard evolved from regional Credit Card programs created during the 1960s, which expanded nationally in the 1970s. Historically, Visa and Mastercard operated as bank-owned cooperatives through which banks jointly established operating rules and key economic terms governing card transactions. Today, Visa and Mastercard are public companies, and the Member Banks are their customers.

18. The Visa and Mastercard networks facilitate Credit Card transactions between Cardholders and Merchants. A Cardholder is an individual who uses a Credit Card to purchase goods or services. A Merchant is a business or individual that accepts payment in exchange for providing those goods or services.

19. Credit Cards allow Cardholders to pay for goods and services at a large number of diverse Merchants by accessing a line of credit extended to the Cardholder by the bank that issued the Credit Card—i.e., the Issuing Bank.

20. Issuing Banks provide Credit Cards to consumers under license from Visa or Mastercard, extend credit to Cardholders, authorize transactions made using those cards, and ultimately pay Acquiring Banks for approved transactions through the Visa or Mastercard network.

21. On the other side of the transaction is the Acquiring Bank. The Acquirer contracts with Merchants to enable acceptance of Visa and Mastercard Credit Cards, transmits transaction information through the Visa and Mastercard networks for authorization by Issuing Banks, and settles approved transactions by receiving funds from Issuing Banks and remitting those funds to Merchants.

22. When the Acquirer remits funds to a Merchant, it withholds a Merchant Discount Fee. The Merchant Discount Fee is made up of three components: the Network Fees to Visa or Mastercard, the Acquirer fees to the Acquiring Bank, and the Interchange Fees to the Issuing Bank. Interchange Fees represent the largest component of the Merchant Discount Fee and therefore the largest component of Merchants' cost of accepting Credit Cards. The Interchange Fee is set as a percentage of the underlying transaction price, combined with a fixed per-transaction component.

23. Interchange Fees were developed during the early formation of Credit Card Networks when Merchants accepting Credit Cards used paper forms called "drafts" to conduct transactions. Interchange Fees purportedly helped offset the costs of card issuance, marketing, fraud risk, and transaction processing, which at the time involved physical transfer of paper transaction records between banks. Early interchange rates were cost-based and were purportedly necessary to induce banks to issue Credit Cards to consumers.

24. Beginning in the 1980s, Credit Card transactions became primarily electronic, and paper drafts were no longer needed for most transactions. The costs associated with transaction processing—including telecommunications, computing, and data processing—declined substantially. At the same time, Credit Card adoption expanded dramatically. In 1970, only sixteen percent of households had a Credit Card. By 2006, that figure had risen to over seventy percent. Credit Cards have become a primary method by which consumers in the United States purchase goods and services.

25. Despite declining processing costs and widespread network adoption, Interchange Fee structures moved away from cost-based models and became increasingly complex. Visa and Mastercard established Default Interchange Fee schedules that vary based on card type, merchant category, transaction channel, and transaction volume. Higher Interchange Fees apply, for

instance, to Premium Credit Cards as compared to standard cards. Premium Credit Cards provide enhanced rewards (e.g., cash back or travel points) to Cardholders.

26. Issuing Banks provide these rewards as they compete to attract Cardholders. This competition is meaningful because Credit Cards are highly profitable to Issuing Banks. Issuing Banks earn revenue from multiple sources, including interest on revolving balances, which typically represent the largest component of revenue for Issuing Banks; Cardholder fees, such as annual fees and late fees; and Interchange Fees, paid by Merchants in connection with each card transaction.

27. But while Issuing Banks compete for consumers, they do not compete on the price charged to Merchants for card acceptance. Rather, Visa and Mastercard set Default Interchange Fees (referenced above) that apply to every transaction absent a bilateral agreement between the Issuing Bank and Merchant. *See* Visa Core Rules § 1.8.1; Mastercard Rules § 8.3.

28. Default Interchange Fee schedules establish standardized pricing across Issuing Banks for particular card products and transaction categories. Card products are categories of payment cards defined by network-established features, such as standard, rewards, premium, or commercial cards, each associated with specified interchange rates. Transaction categories classify transactions based on processing method or Merchant type, including card-present versus online transactions and different Merchant segments. As a result of these Default Interchange Fee schedules, Merchants that accept a particular card product pay the same Interchange Fee on a given transaction regardless of which bank issued the card.

29. Visa and Mastercard set Default Interchange Fees with the objective of maximizing profits among the Issuing Banks, rather than to address Merchant and Cardholder demand, or to recover the costs of providing network services.

30. While Merchants can theoretically contract around these Default Interchange Fees, Visa and Mastercard impose a set of rules to ensure that Issuing Banks have no incentive to engage in such negotiations or to otherwise lower their Interchange Fee to a rate below that set by Visa and Mastercard. A small number of very large Merchants have negotiated bilateral rates below the Default Interchange Fee schedules, but such agreements are the rare exception unavailable to the vast majority of Class members.

## II. Visa and Mastercard Impose Rules on Merchants to Ensure Inflated Interchange Fees Apply.

31. Visa and Mastercard impose a set of rules that prevent Issuing Banks from gaining a competitive advantage by offering lower Interchange Fees to Merchants. These Network Rules bind all Member Banks and are incorporated into agreements between Merchants and their Acquiring Banks, thereby limiting Merchants' ability to negotiate lower fees or steer transactions to lower-cost alternatives. The key rules are described below.

32. Honor All Cards Rules. The Honor All Cards Rules require any Merchant that accepts a Credit Card bearing a Visa or Mastercard brand to accept all Credit Cards bearing that brand, regardless of the Issuing Bank, card product, or cost of acceptance. *See* Visa Core Rules § 1.5.4.2; Mastercard Rules § 5.11.1. In other words, a Merchant that accepts any Visa or Mastercard Credit Card must accept all Visa or Mastercard Credit Cards—including Premium Credit Cards with elevated Interchange Fees and Network Fees. Visa and Mastercard have applied and enforced their Honor All Cards Rules and related acceptance rules to effectively require that any Merchant accepting a Visa- or Mastercard-branded digital wallet or mobile device payment accept all Visa or Mastercard-branded transactions using that same technology. These requirements force Merchants to accept high-cost, device-based transactions regardless of the underlying card product, Issuing Bank, or Interchange Fee. These all-or-nothing requirements

constitute agreements among the Issuing Banks not to compete for Merchants' acceptance of their cards and eliminate any incentive for Issuing Banks to lower their Interchange Fees or otherwise compete on price or terms. The rules thus make the Default Interchange Fees effectively binding on Merchants.

33. No Surcharge Rules. For many years, Visa and Mastercard prohibited Merchants from imposing any surcharge on a Cardholder's use of a Visa or Mastercard Credit Card—that is, Merchants could not add a fee at checkout to recover the Merchant's card-acceptance costs. Beginning in or around 2013, Visa and Mastercard modified these rules to permit Credit-Card surcharging under tightly prescribed conditions. Those conditions required that surcharges not exceed the Merchant's cost of acceptance (and an overall percentage cap), restricted surcharges from targeting particular Issuing Banks, and required advance network notice and customer disclosure. In addition, the practical availability of surcharging remained limited because state laws restricted surcharging in multiple jurisdictions and because the rules effectively prohibited surcharging by Merchants that accepted American Express.

34. Today, Visa and Mastercard continue to prohibit or materially restrict surcharging in ways that prevent meaningful price competition among Issuing Banks. *See* Visa Core Rules §§ 1.5.5.2, 5.5.1.7; Visa Product and Service Rules § 5.5.1; Mastercard Rules § 5.12.2. These rules prohibit Merchants from passing through to Cardholders the higher costs associated with cards from particular Issuing Banks. Absent these rules, Merchants could surcharge a transaction involving higher-fee cards, thereby creating competitive pressure on Issuing Banks to lower Interchange Fees or offer lower-cost card products to avoid surcharging risk (i.e., certain Issuing Banks would have incentive to lower fees and thus avoid the surcharge applied to their higher-cost competitors).

35. No Discount Rules. For many years, Visa and Mastercard imposed No Discount Rules that prohibited Merchants from offering discounts based on a customer's use of a particular Credit Card and permitted discounts only for non-card transactions (e.g., cash or checks). In 2011, pursuant to a consent decree with the Department of Justice, Visa and Mastercard revised these rules to allow discounting tied to card brands (e.g., Discover instead of Visa) or product categories (e.g., standard card instead of premium). But the revised rules continued to prohibit discounting by Issuing Bank within an accepted card product category. For example, if a Merchant offered a discount for using a particular Issuing Bank's standard card, it was required to offer the same discount for other Issuing Banks' standard cards in that product tier. *See* Visa Core Rules § 1.5.4.11; Mastercard Rules § 5.12.1 (Additional U.S. Region and U.S. Territory Rules). As a result, these modified rules did not enable competition among Issuing Banks.

36. No Competing Marks Rules. The No Competing Marks Rules prohibit the issuance of Visa- or Mastercard-branded Credit Cards that bear the brand or mark of a competing Credit Card Network, thereby preventing Credit Cards from being enabled to operate on multiple networks. *See* Visa Core Rules § 1.3.4.6; Mastercard Rules § 4.9. These rules prevent the issuance of cards that would allow Merchants to reduce their cost of acceptance by routing transactions to an alternative Credit Card Network (e.g., Discover) with lower Interchange Fees. By eliminating the ability of Merchants to route transactions over lower-cost networks or incentivize Cardholders to choose lower-cost payment options, the No Competing Marks Rules deprive Merchants of a competitive tool that would otherwise create pressure on Visa and Mastercard and the Issuing Banks to lower their fees to compete with alternative networks. These rules also harm Cardholders by precluding them from receiving the benefit of Merchant strategies—such as discounts or other incentives—that reward the use of lower-cost payment methods.

37. All Outlets Rules. The All Outlets Rules require Merchants that accept Visa- or Mastercard-branded Credit Cards to accept those cards at all locations operating under the same banner (i.e., trade name). These restrictions prevent Merchants from testing location-specific acceptance policies or payment-steering strategies and from using location-level acceptance decisions as leverage to negotiate better terms with Issuing Banks.

38. No Bypass Rules. The No Bypass Rules prohibit Merchants and Member Banks from bypassing the Visa or Mastercard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions on an alternative network even if the Issuing and Acquiring Banks are the same, or even if a third-party processor has agreements with both the Issuing and Acquiring Banks on any given transaction. This restriction bars Issuing Banks and Acquiring Banks from routing Visa or Mastercard transactions directly between themselves outside the Visa or Mastercard network and from competing for Merchant acceptance through lower-cost bilateral routing arrangements.

39. Visa and Mastercard require Acquiring Banks to incorporate these Network Rules into Merchant agreements. This forces Merchants to comply with the Visa and Mastercard Network Rules, including the restraints described above. *See* Visa Core Rules § 1.5.2.1; Mastercard Rules § 5.1.2. Visa and Mastercard require the Acquiring Banks to penalize Merchants that do not adhere to the Network Rules.

## III. Visa's and Mastercard's Anticompetitive Conduct Continued Unabated Despite Restructurings.

40. Before their respective initial public offerings ("IPOs"), Visa and Mastercard operated as networks owned and governed by their Member Banks. The boards of directors for Visa and Mastercard were comprised of executives from member financial institutions—banks that were horizontal competitors in Credit Card issuing and acquiring. Through their ownership

and governance rights, the Member Banks collectively controlled the key decisions of Visa and Mastercard, including the establishment of uniform Default Interchange Fee schedules and anticompetitive operating rules. This structure constituted a classic horizontal agreement among competitors to fix prices charged to Merchants.

41. As regulatory and antitrust scrutiny intensified, both Visa and Mastercard undertook restructuring efforts designed to reduce the appearance of direct bank control over their governance. Mastercard completed an IPO in 2006, and Visa completed an IPO in 2008. Mastercard disclosed in its IPO prospectus that "heightened regulatory scrutiny and legal challenges" contributed to the decision to restructure, acknowledging that "[m]any of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers—or member financial institutions—own all of our common stock and are involved in our governance."

42. But the IPOs did not alter the anticompetitive conduct. Visa and Mastercard repeatedly assured investors, employees, and Member Banks that the restructurings would preserve continuity of core business operations and existing commercial relationships. Visa and Mastercard emphasized that existing rules, contracts, and interchange-related practices would continue to govern operations, and that the new governance structures would not change the way interchange rates were set.

43. Following the IPOs, neither Visa, Mastercard, nor any Member Bank took steps to withdraw from the horizontal price-fixing agreements. Visa and Mastercard continued to establish uniform Default Interchange Fee schedules applicable across competing Issuing Banks and to enforce the Honor All Cards Rules and other Network Rules. Issuing Banks continued to abide by these rules and pricing restraints. Visa's and Mastercard's Interchange Fees continued to

increase after the IPOs, demonstrating that the restructurings did not reduce their ability to impose supracompetitive pricing. The IPOs changed formal ownership structures but left the horizontal price-fixing scheme and competitive restraints fully intact.

44. Even if the IPOs are viewed as having altered the nature of the original horizontal agreement, the post-IPO structure constitutes an unlawful hub-and-spoke conspiracy. In such a conspiracy, a central actor (the hub) coordinates anticompetitive conduct among horizontal competitors (the spokes) through a set of vertical agreements, while the horizontal competitors knowingly participate in a coordinated scheme with the understanding that their competitors are doing the same.

45. Here, Visa and Mastercard function as hubs, establishing uniform interchange schedules and competitive restraints through vertical agreements with each Issuing Bank, which serve as the spokes. The Issuing Banks, as horizontal competitors, have agreed to adhere to these uniform terms, as evidenced by their knowing participation in a coordinated structure with awareness that other competing banks are similarly bound. It would be contrary to any single Issuing Bank's independent economic interest to adhere to these interchange pricing restraints absent assurance that other Issuing Banks would do the same. This interdependence among the competing banks, facilitated and coordinated by Visa and Mastercard, constitutes the "rim" that transforms what might otherwise appear to be separate vertical agreements into a single horizontal conspiracy.

46. Even viewed independently of any horizontal agreement, the Network Rules and Interchange Fee schedules constitute unreasonable vertical restraints of trade. Visa and Mastercard enter into express vertical agreements with each Member Bank, contractually binding them to the network's pricing schedules and anticompetitive rules. These vertical agreements significantly

constrain banks' ability to compete for merchant acceptance through lower interchange pricing, resulting in largely uniform, centrally determined fee levels across Issuers.

## IV. The Networks' Interchange Fee Cartel is an Unreasonable and Unjustified Restraint of Trade.

47. Visa and Mastercard could function efficiently without fixed Interchange Fees and/or other Network Rules. In the 1980s, Visa and Mastercard justified the Default Interchange Fees and Network Rules as necessary to give the banks incentive to issue Credit Cards. By the 1990s, however, the Issuing Banks were earning substantial profits from other Credit Card related sources, including interest rates and annual fees. Network-wide Interchange Fees were no longer necessary to encourage Credit Card issuance. In the intervening decades, global evidence—including from jurisdictions with capped Interchange Fees—confirms that Issuing Banks remain profitable even with much lower Interchange Fees.

48. Moreover, the costs of issuing Credit Cards have declined dramatically. "Float costs" (the cost of funding a Cardholder's grace period) have fallen significantly as interest rates and transaction-processing times declined with the shift to electronic payments. Issuing Banks have also enjoyed substantial savings from decreased hardware, processing, and telecommunications costs, alongside massive economies of scale resulting from increased transaction volumes and industry consolidation.

49. Despite these declines in costs for Issuing Banks, Visa and Mastercard have raised their Default Interchange Fees. This divergence demonstrates that Interchange Fees are not based on cost, but instead reflect the exercise of market power to maintain supracompetitive pricing.

50. Technology has evolved such that Visa and Mastercard now have the full capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants. Visa and Mastercard have the tools to settle funds according to these market-driven agreements, but

instead maintain the Default Interchange Fee structure solely to protect supracompetitive profits for the Member Banks.

## ANTITRUST INJURY

51. When a Merchant accepts a Visa or Mastercard Credit Card as payment for a transaction, that Merchant is the direct purchaser of Credit Card transaction services and directly pays the Interchange Fees associated with that transaction. The Issuing Bank deducts the Interchange Fee from the net transaction amount passed through to the Merchant. Issuing Banks account for Interchange Fees as revenue, and Merchants account for Interchange Fees as an expense. As a result of the anticompetitive conduct alleged in this Complaint, Merchants paid—and continue to pay—substantial, unlawful overcharges during the Damages Period.

52. Visa and Mastercard require Member Banks and other network participants, in specified circumstances, to indemnify them against claims and liabilities arising from the participant's conduct, rule violations, or network-related activities, while separately limiting Visa's and Mastercard's liability to participants through broad limitation-of-liability provisions. *See, e.g.*, Visa Core Rules § 1.1.8.1; Mastercard Rules §§ 18.11.2, 18.12. These provisions require the Member Banks, as network participants, to indemnify Visa and Mastercard against third-party claims arising from participant conduct and materially limit the exposure for Visa and Mastercard to consequential and similar damages.

53. This contractual structure aligns network participants with defending network-related claims rather than challenging network pricing structures. Issuing Banks have no economic incentive to challenge Interchange Fees because they directly receive interchange revenue. Acquiring Banks have no economic incentive to challenge Interchange Fees because they do not pay those fees and, in addition, many Acquiring Banks are also Issuing Banks and, thus, directly benefit from the high Interchange Fees. As a practical matter, these incentives ensure that

participants within the Visa and Mastercard networks have no economic reason—and limited practical ability—to challenge the Default Interchange Fee schedules or other Network Rules.

54. Absent uniform Default Interchange Fees and the Network Rules that maintain them, Issuing Banks would compete for Merchant acceptance by offering lower Interchange Fees and more favorable acceptance terms (e.g., reduced fraud or chargeback risk for Merchants). Merchants would have the ability to negotiate directly, or indirectly through Acquiring Banks and processors acting as Merchant agents, to obtain competitive pricing and transaction terms. Issuing Banks would differentiate their products not only through Cardholder rewards and features, but also through the price charged to Merchants for acceptance. Acquiring Banks and processors would have incentive to compete by helping Merchants reduce acceptance costs rather than enforcing Network pricing rules. In such a competitive environment, Interchange Fees would reflect market forces rather than collectively imposed schedules, and competition among Issuing Banks for Merchant acceptance would drive down Merchant costs while preserving or increasing benefits available to Cardholders.

55. Instead, the Default Interchange Fee schedules and related Network Rules eliminate competition among Issuing Banks for Merchant acceptance and make Interchange Fees effectively non-negotiable. As a result, Merchants pay supracompetitive Interchange Fees and lose the benefits of price competition among Issuing Banks. These inflated fees increase Merchants' cost of acceptance, which in turn forces Merchants to raise retail prices, reduce services, or absorb reduced margins, leading to lost sales and reduced output. During the Damages Period, Merchants paid hundreds of billions of dollars in Interchange Fees above competitive levels, resulting in substantial and continuing overcharges caused by Defendants' anticompetitive conduct.

56. The Default Interchange Fee structure and Network Rules harm consumers rather than benefit them. Even Cardholders who receive rewards do not receive benefits commensurate with the supracompetitive costs that Interchange Fees impose on Merchants and that Merchants pass through, at least in part, to consumers in the form of higher retail prices. The Network Rules limit Merchants' ability to steer consumers to lower-cost payment methods and materially reduce the ability of Merchants to offer Issuing Bank-specific or transaction-specific discounts, price differentials, and other incentives that would be available in a competitive market. Because Merchants must raise prices across the board to recover supracompetitive Interchange Fees, non-rewards consumers effectively subsidize the rewards earned by premium Cardholders, creating a regressive transfer from less-affluent consumers to more-affluent consumers.

57. In a competitive market without Default Interchange Fees and Network Rules, Issuing Banks would still have strong incentives to compete for Cardholders through rewards, pricing, and innovation funded by other substantial revenue streams, including interest income and Cardholder fees. Competition on both sides of the payment platform would reduce Merchant acceptance costs, lower retail prices, and increase output, while forcing Issuing Banks to compete more directly for Cardholders through lower fees, better interest rates, and more innovative products. The Network Rules suppress this competition, resulting in higher prices, reduced consumer choice, and lower overall consumer welfare than would exist in a competitive payments market.

58. The anticompetitive harm to Cardholders exists net of any rewards programs or other benefits funded out of Interchange Fees. After all, Issuing Banks do not in fact rebate the entire increases in Interchange Fees as rewards to Cardholders, nor is there reason to believe that

true competition (through, for example, bilateral agreements with Merchants) would not lead to pro-Cardholder benefits in a world free of anticompetitive restraints.

59. The net effect is clear: with the Network Rules in place, Credit Card transactions carry a higher "combined price" across both sides of the payment platform than they would have carried in the absence of the challenged restraints. In other words, the price of Credit Card transactions—considering fees charged to Merchants and rewards paid to Cardholders—is higher than the price one would expect to find in a competitive market. These restraints reduce output in the form of reduced Merchant acceptance, reduced transaction volume at affected Merchants, and reduced investment and innovation in lower-cost payment alternatives.

60. Defendants' Default Interchange Fees and related Network Rules are not reasonably necessary to achieve any legitimate procompetitive objective. Rather than balancing a two-sided platform, these fees are set to maximize Issuing-Bank profits, deter Issuing Bank defection, and shift Issuing Bank costs—such as fraud risk and Cardholder default—to Merchants. Card issuance would remain profitable absent collectively fixed Interchange Fees, as Issuing Banks earn substantial revenue from interest and Cardholder fees. Moreover, Credit Card Networks—including Defendants themselves—operate efficiently in other jurisdictions under materially less restrictive rules and at substantially lower interchange levels. Even if some form of interchange were justified, Defendants' Default Interchange Fee schedules and related restraints are more restrictive than necessary and foreclose less restrictive alternatives.

## RELEVANT MARKET

61. Credit Card Networks operate two-sided transaction platforms that supply a single product: Credit Card transactions. Each transaction is jointly consumed by Cardholders, who use Credit Cards to complete purchases, and Merchants, who accept those cards as a method of payment. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 545 (2018). The relevant product market

is the two-sided transactions market for Credit Card transactions, which reflects competition among payment networks and Issuing Banks to facilitate transactions between Cardholders and Merchants.

62. Credit Cards constitute a distinct product market separate from debit cards and other forms of payment. Credit Cards provide features that many consumers specifically demand, including access to a line of credit, deferred payment, enhanced fraud protections and chargeback rights, and rewards programs. Debit cards and other forms of tender generally do not provide these features and therefore are not reasonable substitutes for many consumers. Because debit cards are not substitutes for Credit Cards on the Cardholder side of the platform, Merchants cannot discontinue acceptance of Credit Cards or substitute debit acceptance for credit acceptance without losing sales, even in the face of higher Credit Card acceptance costs. Courts have recognized that Credit Card and debit card services are distinct products based on differences in demand and functionality. *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) ("[N]o rational juror could fail to conclude that the [credit and debit] products are distinct.").

63. Market behavior further confirms a distinct Credit Card market. Merchants continue to accept Credit Cards despite materially higher acceptance costs than debit cards, demonstrating that Merchants do not view debit card network services as interchangeable substitutes for Credit Card Network Services. In addition, when debit card interchange fees were capped by the Durbin Amendment—a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 that directed the Federal Reserve to limit interchange fees on debit card transactions to amounts "reasonable and proportional" to the cost of processing—Visa and Mastercard did not reduce Credit Card Interchange Fees, and Credit Card transaction volume

did not decline. This lack of cross-elasticity between credit and debit confirms that the relevant market is the two-sided market for Merchant acceptance and Cardholder use of Credit Cards.

64. The relevant geographic market is the United States. Visa and Mastercard set Default Interchange Fees for Credit Card transactions on a nationwide basis, and the Network Rules governing Merchant acceptance and card issuance are likewise established and enforced at the national level within the United States. Visa and Mastercard, and their largest Issuing Banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole. Courts have recognized the United States as the appropriate geographic market for Credit Card transactions. *See, e.g., United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 339–40 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

**MARKET POWER**

65. Visa and Mastercard, together with the Issuing Banks, jointly and separately possess substantial market power in the market for Credit Card transactions in the United States.

66. Visa, Mastercard, American Express, and Discover are the four dominant participants in the Credit Card transaction market. In 2018, the Supreme Court recognized Visa as "by far the largest" network, holding 45% of the market by transaction volume, with "Amex and MasterCard trail[ing] with 26.4% and 23.3% respectively, while Discover ha[d] just 5.3% of the market." *Am. Express*, 585 U.S. at 537 (figures as of 2013).

67. American Express and Discover traditionally operate three-party "closed-loop" systems in which the network directly issues cards and negotiates directly with Merchants. This differs from Visa's and Mastercard's multi-party systems, which collectively establish Default Interchange Fees paid by Merchants to Issuing Banks. This provides Visa and Mastercard "significant structural advantages over Amex," as "almost every bank that offers credit cards is in

the Visa or MasterCard network." *Am. Express*, 585 U.S. at 537. It is thus "very likely that the average consumer carries, and the average merchant accepts, Visa or MasterCard." *Id.*

68. The market power that Visa and Mastercard possess is long established. Over twenty years ago, the Second Circuit held that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 239–40 (2d Cir. 2003). The district court in that case had "inferred market power from the defendants' large shares of a highly concentrated market," with Visa accounting for 47% of the dollar volume of Credit Card transactions, and Mastercard accounting for approximately 26%. *Id.* at 240.

69. These determinations that Visa and Mastercard possess substantial market power remain well-founded today. Visa and Mastercard continue to account for a dominant share of U.S. Credit Card transactions, and the market remains highly concentrated.

70. Direct evidence further supports the conclusion that Visa and Mastercard possess market power in the relevant market.

71. Visa and Mastercard have repeatedly raised Interchange Fees, and introduced Premium Credit Cards with substantially higher Interchange Fees, without losing Merchant acceptance or transaction volume. This ability to raise prices without losing customers is direct evidence of market power.

72. Visa and Mastercard do not set Interchange Fees based on cost, as they did during early network development and as they would do in a competitive market. Instead, they set fees based on Merchants' perceived elasticity of demand. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 99 (E.D.N.Y. 2024) ("Mastercard

executives have admitted that they do not consider costs when setting prices.").[1] That Interchange Fees have risen even as costs have declined is further evidence of market power.

73. Visa and Mastercard also exercise price discrimination, by varying Interchange Fees by Merchant size, transaction size, card type, and Merchant category. They impose the highest fees on Merchants least able to discontinue acceptance. *See Visa U.S.A.*, 163 F. Supp. 2d at 340 ("The reality is that Visa and MasterCard are able to charge substantially different prices for those hundreds of thousands of merchants who must take credit cards at any price because their customers insist on using those cards."); *Payment Card*, 714 F. Supp. 3d at 99 ("Mastercard has the ability to price discriminate."). This ability to discriminate, coupled with consistently high profit margins, further demonstrates substantial market power. *See Payment Card*, 714 F. Supp. 3d at 99, 103.

74. Visa and Mastercard protect their market power through a series of anticompetitive rules that Merchants would not accept in a competitive market. These Network Rules and the Default Interchange Fees convert Merchant acceptance into an all-or-nothing proposition. Merchants cannot selectively reject higher-cost cards, steer customers to lower-cost payment forms, reduce acceptance in response to price increases, or promote competition by pitting Issuing Banks against one another. The ability of Visa and Mastercard to impose such restrictive terms is "direct evidence of market power." *Payment Card*, 714 F. Supp. 3d at 99.

75. High barriers to entry further entrench this market power. As the Second Circuit explained, "[n]ew entrants face a chicken-and-egg problem because merchants value a payment system only if a sufficient number of cardholders use it and cardholders value a payment card only if a sufficient number of merchants accept it." *In re Am. Express Anti-Steering Rules Antitrust*

---

[1] Visa did not move for summary judgment based on its lack of market power and, thus, the district court did not opine on Visa's market power. *See Payment Card*, 714 F. Supp. 3d at 97 n.27.

*Litig.*, 19 F.4th 127, 135 (2d Cir. 2021) (internal quotation marks omitted). Entry into the market would also require massive investment in network infrastructure and brand development. As a result, no new Credit Card Network has successfully entered the market since Discover in 1985, and Discover itself has never achieved more than a single-digit market share. *See Payment Card*, 714 F. Supp. 3d at 99 ("The credit-card transaction market is highly concentrated and has had no new entrants in nearly forty years."). These barriers to entry demonstrate that Visa and Mastercard need not fear competitive entry, further confirming their market power.

76. Visa and Mastercard do not meaningfully constrain one another in the Merchant acceptance market. Instead, they maintain parallel rule structures and pricing frameworks that limit competition between them, and many Merchants must accept both Visa and Mastercard Credit Cards to remain commercially viable.

77. Collectively and individually, Visa and Mastercard have used these structural advantages and restraints to acquire, maintain, and exercise substantial market power throughout the Damages Period, causing ongoing harm to Merchants.

## FUTURE RELEASE

78. As a measure of their market power, Visa and Mastercard have successfully maintained their restrictive rules on Merchants despite decades of litigation challenging such conduct as anticompetitive.

79. Merchants challenging this conduct brought their first class action complaint in 2005. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 229 (2d Cir. 2016). After more than seven years of litigation, the parties executed a settlement agreement, which the district court approved. *Id.* at 229. The settlement agreement divided the plaintiffs into two classes: a damages class and an injunction class. *Id.* The former would receive more than $5 billion in compensation, while the latter would receive modest changes to the

Network Rules. *Id.* In exchange, the plaintiffs agreed to a perpetual release of all future antitrust claims. *Id.*

80. In 2016, the Second Circuit invalidated the settlement agreement after concluding that a "fundamental conflict" existed between the damages class and the injunction class. *Id.* at 236. The court explained that the damages class "would want to maximize cash compensation for past harm," while the injunction class "would want to maximize restraints on network rules to prevent harm in the future." *Id.* at 233. The class representatives were all members of the damages class and, thus, were "in the position to trade diminution of [injunctive] relief for increase of [monetary] relief." *Id.* at 234.

81. After the case was remanded, the damages class—proceeding separately from the injunction class—reached a new settlement for $5.6 billion. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 714 (2d Cir. 2023). The settlement agreement defined the class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [January 24, 2019]." *Id.* at 714 (alterations in original). The agreement provided that each claimant would receive a *pro rata* share of the monetary fund "in accordance with the relative economic interests of the Claimants as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." *Id.*

82. In exchange for this relief, "each class member released claims 'arising out of or relating to' any conduct or acts that were or could have been alleged in the litigation." *Id.* The release not only covered all claims that had accrued during the class period, but also all claims that would "accrue no later than five years after the Settlement Final Date [August 8, 2023]." *Id.*[2] The

[2] The Second Circuit denied petitions for rehearing on April 25, 2023. The time to seek certiorari expired

release of claims, by its own terms, "extend[s] to, but only to, the fullest extent permitted by federal law." *Id.* (alteration in original).

83. The district court approved the settlement over various objections to the Future Release, including objections that the Future Release contravened public policy, violated the identical factual predicate doctrine, resulted in inadequate representation for newer Merchants (i.e., those who started accepting Visa and/or Mastercard toward the close of the class period), and caused certain class members to be treated inequitably relative to others (e.g., those with future claims compared to those without). *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25–27 (E.D.N.Y. Dec. 16, 2019).

84. The Second Circuit affirmed approval of the settlement, though it expressly left open the legality of the Future Release. The Second Circuit noted that newer Merchants claimed to be inadequately represented in violation of Rule 23(a)(4) because "the class representatives, all of which had accepted Visa and/or MasterCard for the full fifteen-year class period, . . . had incentive to forgo five years (or more) of future claims in exchange for the cash that would afford newer merchants no more than a marginal recovery." *Fikes Wholesale*, 62 F.4th at 720. The court also noted the related challenge of inequitable treatment in violation of Rule 23(e)(2)(D). *Id.*

85. But the Second Circuit concluded that it had "no occasion to decide these questions," since "the release of claims provision contains a de-facto severability clause," such that the release extends only to "the fullest extent permitted by federal law." *Id.* The court explained that "[t]his language ensures that the Settlement Agreement will stand even if certain aspects of the release were to fall." *Id.* A decision as to "whether the future release violates federal

90 days later, on July 24, 2023. Under the Settlement Agreement, the "Settlement Final Date" occurs ten business days after appellate proceedings are no longer subject to further review, which was August 8, 2023.

law," the court continued, "can await a case in which the issue would directly affect the proceedings." *Id.*

86. Litigation concerning the same Network Rules continued after the 2019 Settlement Agreement. Claims brought by the injunction class, and by Merchants who opted out of the damages class, proceeded through summary judgment. Many of those cases have settled or are in settlement proceedings, while others remain on track for trial.

87. The anticompetitive conduct alleged herein—including the imposition of Default Interchange Fees and the enforcement of the Network Rules—has continued without interruption throughout the Damages Period, with each Credit Card transaction processed under these rules giving rise to a new and independent antitrust injury. Defendants' ongoing updating and enforcement of Network Rules, moreover, constitutes a continuing antitrust violation that restarts the statute of limitations with each supracompetitive interchange charge.

88. But while the challenged conduct remains unchanged and the subject of ongoing litigation, the Future Release purports to extinguish damages claims that accrued after the close of the class period (i.e., after January 24, 2019).

89. Prior to the Second Circuit's decision in *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023), Plaintiffs and members of the Class reasonably understood—based on the district court's approval of the 2019 Settlement Agreement—that the Future Release extinguished claims arising from post-class-period conduct. The Future Release thus had the practical effect of dissuading Merchants from filing another lawsuit. On March 15, 2023, the Second Circuit issued its decision which upheld the 2019 Settlement Agreement and which clarified that the release extends only "to the fullest extent permitted by federal law." *Fikes Wholesale*, 62 F.4th at 720. Because Plaintiffs reasonably relied on the district court's approval

of the 2019 Settlement Agreement in refraining from filing suit, their claims are timely under principles of equitable tolling.

90. The Future Release violates federal law and is therefore invalid. First, the release violates Federal Rule of Civil Procedure 23 because it resulted in absent class members being inadequately represented and inequitably treated. Second, the release violates the identical factual predicate doctrine because unasserted future claims held only by some class members were sacrificed to benefit the class as a whole. And third, the release violates public policy because it granted Visa and Mastercard prospective immunity from federal antitrust laws spanning nearly a decade. Such a release cannot stand.

## CLASS ACTION ALLEGATIONS

91. Pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following class (the "Class"): All persons, businesses, and other entities that have accepted Visa and/or Mastercard Credit Cards in the United States at any time from and after January 25, 2019.

92. Excluded from the Class are Defendants, their parent companies, their subsidiaries and affiliates, their officers and directors, their co-conspirators, and the United States Government.

93. The Class is readily ascertainable because records of the relevant transactions should exist.

94. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has millions of members, the exact number and their identities being known to Defendants and their co-conspirators.

95. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

96. There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

a. Conspiracy issues.

i. Whether Visa and Mastercard illegally fixed uniform schedules of Default Interchange Fees for Credit Card transactions, thereby extracting supracompetitive Interchange Fees from Class members;

ii. Whether Visa and Mastercard possess or exercise market power in the relevant market alleged in this Complaint;

iii. Whether the Network Rules imposed by Defendants artificially inflated the level of Interchange Fees imposed on Merchants or facilitated Defendants' respective price-fixing arrangements; and

iv. Whether the conspiracies of Visa and Mastercard and their Member Banks continued after Visa and Mastercard reorganized through IPOs.

b. Impact and damages issues.

i. Whether all or virtually all class members were overcharged for Visa and Mastercard transactions when higher Interchange Fees were extracted from them than could have occurred in a competitive market;

ii. Whether Interchange Fees in the relevant markets would exist at their current level—if at all—absent the above-referenced conduct; and

iii. The proper measure of damages sustained by the Class as a result of the conduct alleged herein.

97. Plaintiffs are represented by competent counsel with experience litigating major class actions and other complex civil matters.

98. Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

99. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the court and would create a risk of inconsistent or

varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would ensure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## FIRST CAUSE OF ACTION
### Violation of Section 1 of the Sherman Act by Visa

100. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 99 as if fully set forth herein.

101. The use of Credit Cards issued by members of Visa and the rules governing the use of such cards occur in and substantially affect interstate commerce.

102. Visa and its Member Banks knowingly entered into and participated in a common scheme to restrain competition in the market for Credit Card transactions.

103. Visa and its Member Banks are a combination within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Visa's rules constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition among its bank members through the rules governing Credit Cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for Merchant acceptance of the Credit Cards each issues. No individual Issuing Bank would independently forgo the ability to compete for Merchant acceptance absent an agreement, managed by Visa, under which other Issuing Banks would do the same.

104. In addition, Visa's rules and related contracts entered into prior to Visa's IPO constituted horizontal agreements from which Visa and the Member Banks have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements. Nor did its members take any steps to withdraw from or otherwise repudiate the rules and agreements. These agreements were continuously maintained and enforced during the Damages Period.

105. Alternatively, Visa operates and enforces an unlawful hub-and-spoke conspiracy. Visa acts as the hub by establishing uniform interchange pricing and uniform Network Rules and by contractually requiring each Issuing Bank to adhere to those requirements. The Issuing Banks, which are horizontal competitors, act as spokes by knowingly agreeing to adhere to uniform pricing and restraint structures with the understanding that competing Issuing Banks are doing the same. Each Issuing Bank's adherence to Visa's pricing and restraint structure would be contrary to that bank's independent economic self-interest absent assurance that competing Issuing Banks would do the same. This interdependence among the competing banks, facilitated and coordinated by Visa, constitutes a single conspiracy in restraint of trade.

106. Alternatively, after the Visa IPO, the Network Rules constitute vertical agreements in restraint of trade.

107. As alleged above, Visa and its members jointly have market power in the market for Credit Card transactions.

108. Individually and in combination, the Network Rules constitute an illegal agreement to fix the price of acceptance of Visa-branded Credit Cards and to prevent the operation of, and interfere with, the competitive process with respect to the acceptance of Visa-branded Credit Cards, in violation of Section 1 of the Sherman Act. The price-fixing conspiracy and agreements among

competitors not to compete were *per se* violations of Section 1. Even if analyzed under a rule of reason, these agreements were unreasonable restraints of trade in violation of Section 1. No legitimate business purpose or efficiency benefit offset their substantial anticompetitive effects.

109. Cardholders do not receive countervailing benefits to the harm caused Merchants through the Network Rules and Default Interchange Fees. Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to Cardholders, reducing the number of Merchants willing to accept Credit Cards and the overall volume of Credit Card transactions, and constraining innovation in payment methods and technology.

110. As alleged above, Plaintiffs and Class members have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of Credit Cards by Merchants, resulting from Visa's Network Rules. The effect of these restraints has been to increase the cost of acceptance of Credit Cards paid by Plaintiffs and Class members, thereby injuring both Merchants and Cardholders through higher costs and decreased consumer welfare. Plaintiffs and Class members directly paid supracompetitive Interchange Fees and are direct purchasers of Credit Card transaction services.

111. As a direct and proximate result of these violations of Section 1 of the Sherman Act, Plaintiffs and Class members have been injured in their business and property. Plaintiffs and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act by Mastercard**

112. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 99 as if fully set forth herein.

113. The use of Credit Cards issued by members of Mastercard and the rules governing the use of such cards occur in and substantially affect interstate commerce.

114. Mastercard and its Member Banks knowingly entered into and participated in a common scheme to restrain competition in the market for Credit Card transactions.

115. Mastercard and its Member Banks are a combination within the meaning of Section 1 of the Sherman Act. Mastercard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Mastercard's rules constitute horizontal agreements among Mastercard and its members both prior to and after Mastercard's reorganization and IPO. Mastercard has served and continues to serve as the manager of a combination that limits competition among its bank members through the rules governing Credit Cards agreed to by Mastercard members. Accordingly, by these arrangements, Mastercard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for Merchant acceptance of the Credit Cards each issues. No individual Issuing Bank would independently forgo the ability to compete for Merchant acceptance absent an agreement, managed by Mastercard, under which other Issuing Banks would do the same.

116. In addition, Mastercard's rules and related contracts entered into prior to Mastercard's IPO constituted horizontal agreements from which Mastercard and the Member Banks have never withdrawn. In changing its corporate form at the time of the IPO, Mastercard did not take any affirmative action to end its existing anticompetitive arrangements. Nor did its members take any steps to withdraw from or otherwise repudiate the rules and agreements. These agreements were continuously maintained and enforced during the Damages Period.

117. Alternatively, Mastercard operates and enforces an unlawful hub-and-spoke conspiracy. Mastercard acts as the hub by establishing uniform interchange pricing and uniform

Network Rules and by contractually requiring each Issuing Bank to adhere to those requirements. The Issuing Banks, which are horizontal competitors, act as spokes by knowingly agreeing to adhere to uniform pricing and restraint structures with the understanding that competing Issuing Banks are doing the same. Each Issuing Bank's adherence to Mastercard's pricing and restraint structure would be contrary to that bank's independent economic self-interest absent assurance that competing Issuing Banks would do the same. This interdependence among the competing banks, facilitated and coordinated by Mastercard, constitutes a single conspiracy in restraint of trade.

118. Alternatively, after the Mastercard IPO, the Network Rules constitute vertical agreements in restraint of trade.

119. As alleged above, Mastercard and its members jointly have market power in the market for Credit Card transactions.

120. Individually and in combination, the Network Rules constitute an illegal agreement to fix the price of acceptance of Mastercard-branded Credit Cards and to prevent the operation of, and interfere with, the competitive process with respect to the acceptance of Mastercard-branded Credit Cards, in violation of Section 1 of the Sherman Act. The price-fixing conspiracy and agreements among competitors not to compete were *per se* violations of Section 1. Even if analyzed under a rule of reason, these agreements were unreasonable restraints of trade in violation of Section 1. No legitimate business purpose or efficiency benefit offset their substantial anticompetitive effects.

121. Cardholders do not receive countervailing benefits to the harm caused Merchants through the Network Rules and Default Interchange Fees. Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to Cardholders, reducing the

number of Merchants willing to accept Credit Cards and the overall volume of Credit Card transactions, and constraining innovation in payment methods and technology.

122. As alleged above, Plaintiffs and Class members have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of Credit Cards by Merchants, resulting from Mastercard's Network Rules. The effect of these restraints has been to increase the cost of acceptance of Credit Cards paid by Plaintiffs and Class members, thereby injuring both Merchants and Cardholders through higher costs and decreased consumer welfare. Plaintiffs and Class members directly paid supracompetitive Interchange Fees and are direct purchasers of Credit Card transaction services.

123. As a direct and proximate result of these violations of Section 1 of the Sherman Act, Plaintiffs and Class members have been injured in their business and property. Plaintiffs and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Declaratory Judgment That the Future Release Is Invalid and Unenforceable

124. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 99 as if fully set forth herein.

125. This claim is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain a declaration concerning the validity and enforceability under federal law of the Future Release contained in the 2019 Settlement Agreement.

126. An actual, present, and justiciable controversy exists between Plaintiffs and Defendants regarding whether the settlement release extinguishes Plaintiffs' claims arising from Defendants' post-class-period conduct.

127. Defendants have asserted, and will continue to assert, that the 2019 Settlement Agreement release bars liability for conduct occurring during the period purportedly covered by the release. Plaintiffs dispute that assertion and contend that the release is invalid and unenforceable under federal law insofar as it purports to release claims that accrued after the close of the class period.

128. The validity of the Future Release directly affects the claims asserted in this action, and judicial resolution is necessary to determine the parties' rights and obligations. Defendants are expected to invoke, and will invoke, the Future Release as a defense to Plaintiffs' Sherman Act claims.

129. The Future Release is invalid because it exceeds the limits imposed by federal law governing class actions and the permissible scope of settlement releases.

130. The Future Release violates Rule 23(a)(4) because newer Merchants received inadequate representation. A Merchant that first accepted Credit Cards on the last day of the class period, for instance, would never agree to a deal in which it received only one day of relief and, yet, had to release nearly ten years of future claims. The class representatives, each in business for the full fifteen-year class period, clearly had a different calculus.

131. The Future Release independently violates Rule 23(e)(2)(D) because it requires class members to surrender claims of materially different value in exchange for uniform consideration, resulting in inequitable treatment among class members. It likewise violates the identical factual predicate doctrine, which exists "to protect members of the class who have had no opportunity to protect themselves." *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 20 (2d Cir. 1981). These principles do not permit class representatives to trade away

unasserted future claims held only by some class members in order to obtain a benefit for the class as a whole.

132. The class-wide release of future claims also violates public policy by undercutting "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action." *Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 328 (1955). As the Supreme Court has explained, "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws," *Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965), and it is thus impermissible to "confer on [defendants] a partial immunity from civil liability for future violations," *Lawlor*, 349 U.S. at 328.

133. Plaintiffs seek a declaration that the Future Release is invalid and unenforceable to the extent it purports to release claims arising after the class period or otherwise exceeds the limits permitted by federal law.

134. For the avoidance of doubt, Plaintiffs do not seek to disturb the 2019 Settlement Agreement or the distribution of settlement funds, but instead seek a determination of the permissible scope of the Future Release under federal law—an issue the Second Circuit expressly left open.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

1. An order certifying this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure;

2. A judgment that Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein;

3. A judgment awarding Plaintiffs and the Class monetary damages for the fullest time period permitted by law, in an amount to be determined at trial, including, but not

limited to, compensatory damages for past and future injury, treble damages, and pre-judgment and post-judgment interest, as permitted by law;

4. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that the Future Release contained in the 2019 Settlement Agreement is invalid and unenforceable to the extent it purports to release claims arising after the class period or otherwise exceeds the limits of federal law;

5. An award of reasonable attorneys' fees, costs of suit, and expenses as permitted by 15 U.S.C. § 15(a), and any other applicable provision of law; and

6. Such other and further relief as the Court deems just, equitable, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues so triable.

Dated: April 21, 2026
New York, New York

**BRESSLER LLP**

By: /s/ *Jason Bressler*

Jason Bressler
Kenneth L Bressler
175 Varick Street, Suite 410
New York, NY 10014
Tel.: (212) 444-2388
jason.bressler@bresslerllp.com
ken.bressler@bresslerllp.com

*Attorneys for Plaintiffs*